BRANT ex dem. THE HEIRS OF DAVID PROVOOST against GELSTON.

A. being seised of lands, by indenture, " in consideration of natural love and affection, and for the better maintenance of the grantees, conveyed the premises by the words ' give, grant, alien, enfeoff and confirm,' to his daughter, H. and B. her husband, to the use of H. for life, with power to her to sell the same in fee, at any time, if she choose, to any person, by deed or will, and the money arising from such sale to keep for her own use and maintenance ; and in case the said H. should not sell the premises, then, after her death, he, the said A. conveyed the same to B. the son-in-law, for life, and after his death, to the heirs of the body of H. and his, her, or their heirs and assigns for ever, equally to be divided between them, share and share alike." B. and H. took possession, and, afterwards, for the consideration of five shillings, by lease and release, conveyed the premises to C. in fee, in trust that he should reconvey the same premises to B. in fee ; and C. being so seised by virtue of such lease and release, on the next day, for the consideration of ten shillings, reconveyed the premises to B. who, afterwards made his will, devising the premises to D. for 31 years, and died. H. died without issue, and A. afterwards died, leaving four sons and four daughters, his heirs at law.   In an action brought by the heirs at law against

a tenant under D. it was held, that H. took an estate for life, with a vest-
ed remainder *in tail;* that the words, " heirs of the body," &c. were words
of *limitation*, and *not of purchase*, notwithstanding the words added, " and
to his, her, or their heirs and assigns," &c. which were to be rejected as re-
pugnant to the estate created by the preceding words ; and that the power
to H. was intended for her benefit, and was well executed ; and the estate
vested in B. and those claiming under him.

THIS was an action of ejectment for lands in the city of
New York. The jury found a special verdict.

The following are the material facts which it contained :
David Provoost, the elder, of New York, being seised in fee
of the premises in question, on the 10th day of April, 1762,
by an indenture between him and Jacob Brewerton, of
King's county, and Helena his wife, (who was the daughter
of the said David,) in consideration of natural love and af-
fection, and for the better maintenance of the grantees, con-
veyed by the words " give, grant, alien, enfeoff and
confirm," to them the *premises, to the use of Hele-   [*385]
na, for her life, with power to her to sell the same in
fee at any time if she should choose to any person by deed or
will, and the consideration money arising on such sale, to keep
for her use and maintenance, and by the said indenture rati-
fied such sale or sales as good and valid.   And in case Hele-
na should not sell the premises as aforesaid, then after her
death, he, the said David Provoost, by the same deed, convey-
ed the same to the said Jacob Brewerton, for his life, and after
his death to the heirs of the body of Helena, and to his, her, or
their heirs and assigns forever, equally to be divided be-
tween them, share and share alike ; yielding and paying
therefor to the said David Provoost, the yearly income, rents
and profits thereof during his life, if the same should be de-
manded, and not otherwise.

By virtue of this deed, Jacob Brewerton and Helena
took possession of the premises, and being so seised, afterwards
by lease and release, bearing date respectively the 11th and
12th days of September, 1764, and for the consideration of
five shillings, conveyed the same to Augustus Van Cortlandt,
of the city of New York, in fee ; and in trust, that he should

reconvey the same premises to the said Jacob Brewerton in fee.

The said Augustus Van Corlandt-beng seised thereof, accordingly did, by lease and release, bearing date respectively the 13th and 14th days of September, 1764, and for the consideration of ten shillings, reconvey the premises to the said Jacob Brewerton, in fee, who entered, was seised, &c. and being so seised of the premises, did, on the 20th day of March, 1789, make his last will, and thereby devised the premises to Robert Carter, jun. and Carey Ludlow, for the term of thirty-one years, and afterwards, on the 19th October, 1790, died. Helena died the 11th January, 1769, without issue, and David Provoost the elder died on] the 29th October, 1783, without ever having demanded rent [*386] for *the premises, and leaving William Provoost, James Provoost, John Provoost, David Provoost, Helena Bermore, Catherine Provoost, Johanna, the wife of John Brown, and Johanna, the wife of Samuel Kelly, his heirs at law.

Robert Carter, jun. and Carey Ludlow, after the death of Jacob Brewerton, to wit, on the 1st day of November, 1790, demised the premises to the defendant, to hold from year to year.

Troup and Hamilton, for the plaintiff.

Riggs and Harison, contra.

KENT, J. The following questions have been raised by the counsel :

1. Whether there was a power given to Helena, and properly executed by her, to vest the fee of the premises in her husband, Jacob Brewerton ?

If this question should be answered in the negative, then,

2. Whether an estate tail was not vested in her by the deed of 1762, so as to render her conveyance valid, under the act of 23d February, 1786 ?

It will be unnecessary for me to give any opinion on the first question, relative to the power, because I am of opinion that the second question must be answered in favor of the defendant. I am satisfied, upon a full consideration of the

case, that Helena took an estate for life, with a vested remainder in tail.

The deed gives the estate "to Helena for life, with power to sell, &c. then to Jacob Brewerton for life; then to the heirs of the body of Helena, and to his, her or their heirs and assigns for ever, equally to be divided between them, share and share alike." In consequence of this intervention of an estate of freehold, between the freehold to her and the subsequent limitation to her heirs, the subsequent limitation is not immediately *executed in her; but be-  [387] comes a vested remainder, to be executed in possession, on the determination of the mesne estate. (Fearne, 26, 27, 32, 33. Walk. on Desc. 167. Harg. Law Tracts, 575.)

In giving this construction to the deed, I am governed by what is commonly called the rule in Shelly's case, (1 Co. 104. Co. Lit. 22, b, 319, b, 379, b, 377, a,) which is, that where the ancestor takes an estate of freehold, with a remainder, either mediate or immediate, to his heirs, or the heirs of his body, the word heirs is a word of limitation of the estate, and not of purchase.

The only difficulty, as to this conclusion, arises from the additional words subsequent to the words, heirs of the body of Helena, viz. " and to his, her, or their heirs and assigns forever, equally to be divided between them, share and share alike."

It must be admitted, that there is greater latitude of construction applied to wills than to deeds; and the rule generally has been allowed to be of more imperative control in the one instrument than in the other; (Fearne, 256; Harg. 502;) but the cases of *Waker* v. *Snow*, (Palm. 359,) and *Lisle* v. *Gray*; (T. Raym. 315,) arose, not upon a devise, but the one upon a fine, and the other upon a covenant to stand seised to uses. Those two cases accordingly show, that even in deeds, the word heirs has not always been held, at law, a word of limitation, but as capable of being controlled by superadding explanatory words; or words of limitation, denoting a different species of heirs.

Considering, however, the age and sanction of the rule,

and that it is a case of a legal estate, founded on a deed, the declaration of the intent to change the word heirs, into a word of purchase, ought, at least, to be unequivocal, before the rule can cease to apply. (Hob. 33, 34.)

I am satisfied of such an intention in the present case. The superadded words do not necessarily import an intent to divert the legal course of descent; nor that other [*388] *or different persons were intended, and not that succession of persons denominated heirs at law.

The language, in cases on wills, where that intent has been deemed sufficiently explicit, was generally much more imperative than this. In *Burchett* v. *Durdant*, (2 Vent. 311; Carth. 154;) the testator devised to A. for life, remainder to the heirs male of his body now living. This was conclusive to show that the testator could not intend the whole line of heirs, but only used the term as a *designatio personæ.* So in the case put by Anderson in Shelly's case, (Co. 95, *b*,) where one enfeoffed A. for life, remainder to his heirs, and their heirs female, it was evident the feoffor intended a different class of persons from the whole inheritable blood of A. and without making the word heirs a word of purchase, the limitation to the heirs female could not be admitted. Again, in the case of *Doe ex dem. Long* v. *Laming*, (2 Burr. 1100,) which was a devise of lands held in *gavelkind* to A. and to the heirs of her body, as well females as males, the testator expressly rescinded the inheritable succession, and designated a different species of heirs, because females could not be admitted in a course of descent, in *gavelkind.*

There is no such necessity, in this case, of deviating from the rule, because there is no such unequivocal provision, which requires it to be set aside. It may be said that the words, "and his, her, or their heirs and assigns, equally to be divided," &c. are sufficient in a deed, as well as in a will, to create a tenancy in common; and that as the law stood at the time of the execution of the deed, the heirs of the body of Helena could not take as tenants in common, unless those words be considered as meaning children, and that those children should take as purchasers, and that this must ac-

cordingly be the intent of the deed; and also that these children should transmit an estate in fee to their descendants.

*There is certainly much plausibility and force in [*389] this construction. But in answer to it, we may observe, that the words, equally to be divided, &c. if in a deed were formerly held to be a joint tenancy; (1 Eq. Cas. Abr. 291; 2 Black. Comm. 193;) and although they have since been held to operate otherwise, (Sayer, 67; 1 Wils. 34,) the employment of them by the grantor is by no means certain evidence of his intent to control the legal operation of the preceding words, and prevent the inheritable blood of Helena from taking in the character of heirs.(a) On the contrary, the better inference is, that the grantor intended, after the limitations for life, that the estate should go to every person who could claim as heir to Helena. The words of limitation superadded are not descriptive of a different species of heirs from the first words, so as to break in upon, and divert the line of descent from the ancestor. It is rather an attempt in the grantor to prescribe a different qualification to the heirs of Helena, in their character as heirs, than what the law had prescribed. And it being once ascertained that the grantor did not use the word heirs for any particular person, in that instance inaptly denominated heir, but intended by it, as a *nomen collectivum*, the line of inheritable succession; and that Helena, and not any individual who should happen to be the heir, at the time of her death, was to be the ancestor from whom that line was to be deduced, then I agree that the rule in Shelly's case applies with irresistable control. The heirs of her body must take in the quality, as well as the character of heirs; and all the efforts of the grantor to change their qualifications, while he admits their character, by saying they shall take by purchase, or as tenants in common, are fruitless and of no avail.

*There are cases in point in favor of this conclu-   [*390] sion. That of *King* v. *Burchell*, (Amb. 379,) was

(a) See 1 Wash. Rep. 9, 10.   Bro. C. C. 219, 220. 221.   Fearne, 258.

a devise to A. for life, remainder to his issue male, and to his and their heirs, share and share alike.    These are near-ly the same superadded words of limitation, as in the present case, and equally tending to show that a contingent fee in the children of A. to be held by them, as tenants in common, was intended.    It was, however, decreed, that A. took an estate tail.    So the case of *Goodright* v. *Pullyn*, (2 Lord Raym. 1437,) was a devise to A. for life, remainder to the heirs male of his body, and his heirs forever; and it was held that the subsequent words, his heirs, were not sufficient to defeat the operation of plain and clear words, and a settled rule of law.    The case of *Morris ex dem. Andrews* v. *Le Gay and Wood,* (cited in 2 Burr. 1102,) was to the like effect.

On the other hand, I am aware there are authorities, such as *Archer's case,* (1 Co. 64, *b*,) *Backhouse* v. *Wells,* (2 P. Wms. 476,) and several others that look very much the other way.    In the case of *Backhouse* v. *Wells,* there was a demise to A. for life, remainder to the issue male of his body, and to the heirs male of such issue male, and it was decreed that A. took only an estate for life.    Indeed, there are a number of authorities apparently difficult to reconcile, to be cited and arrayed on each side, in the attempt to mark the precise line of distinction which separates, in all cases, words of purchase from words of limitation.    The attempt has frequently been made with much spirit and ability; and I am willing to believe it has been attended with success.    But, at present, I deem it unnecessary to involve myself in a particular analysis of the perplexing authorities and distinctions that have arisen upon the celebrated rule in Shelly's case.

It is sufficient to observe, that the rule itself, and the very interesting manner in which it has been considered, must be familiar to every well informed lawyer; [*391]    that I *have paid respectful attention to the leading cases, to the elaborate treatises and infinite talents, exerted on the subject; and the result in my mind is, that the rule is of binding authority, and that there is nothing in

Brant v. Gelston.

the present case sufficiently determinate to prevent its application.

Having thus concluded that Helena took a vested remainder in tail, it is not material whether such remainder be mediate or immediate to the estate for life, since, in either case, the tenant gains the same power over the inheritance, and of defeating the entail. (Harg. Law Tracts, 575, 576.) Her conveyance accordingly to Augustus Van Cortlandt in fee, and his conveyance to Jacob Brewerton in fee, were ratified and confirmed by the act of the 23d February, 1786, (9 sess. c. 12, s. 2,) which declares, that where lands had before been conveyed by a tenant in tail, and the person to whom the conveyance was made, and his heirs or assigns had, from the time of the conveyance to the day of passing the act, been in the uninterrupted possession of the land, and held the same under the conveyance, such conveyance should be as effectual as if the tenant in tail had at the time been seised in fee. It is found, by the verdict, that Jacob Brewerton was seised of the premises in 1789, and nothing to the contrary appearing, this is sufficient to bring him within the provision of the act.

The defendant deriving title from him, judgment ought, accordingly, to be for the defendant.

LEWIS, Ch. J. The following questions have been raised.

1. What estate passed to Helena Brewerton by the conveyance of 1762 ?

2. Was the power to sell or devise well created ?

3. Was it well executed ?

As to the estate which Helena took, it is an ancient and well settled rule, that where, by the same instrument, *the ancestor takes an estate of freehold, with    [*392] remainder, mediately or immediately, to his *heirs*, general or special, the heir shall take by descent, and for this purpose the inheritance shall rest in the ancestor ; *heirs* being construed a word of limitation and not of purchase. (1 Vent. 214, 225. 2 Lev. 59. 2 Ld. Raym. 1437. 1 Co. 104. *Shelly's case.* Fearne, 21.)

The authorities in support of this rule are very numerous,

and as far as my researches have extended, are uniform, except in cases of trusts, and perhaps dispositions of gavelkind lands. The cases of *Archer*, (1 Co. 64, *b*,) *Lisle* v. *Gray*, (2 Lev. 223,) which were adduced as exceptions, are not so. In the case of Archer, the terms are, *next heir male*, in the singular; and much stress appears, from authorities in which this case is cited, (2 Str. 731,) to have been laid on the word *next*. This was not, however, the turning point of the cause; it was, that the feoffment of the tenant for life, barred the remainder.

In the case of *Lisle* v. *Gray*, Lisle covenanted to stand seised to the use of himself for life, remainder to the use of Edward, his son, for life, remainder to the first, second, third, fourth, &c. sons of the said Edward, in succession, and the heirs male of their bodies : then follow these words, *and so severally and respectively, to every of the heirs male of the body of the said Edward, and the heirs male of the body of such heirs male,* &c. The judgment of the king's bench was, that the *heirs male of the body,* superadded to the limitations to the several sons of Edward in succession, should not control them so as to defeat the evident intention of the covenantor ; but should be governed by them, and should be intended *sons,* as in the principal clause, and thus were words of purchase, and not of limitation. The judgment, we are told, was afterwards affirmed in the exchequer. (2 Atk. 90, note. 2 Burr. 1100.)

In *Long and Laming*, (2 Burr. 1100,) many cases are cited by Lord Mansfield to show that the rule has [*393] been *and may be departed from by *courts of law*, in *cases of devise*, where an adherence to it would manifestly defeat the intent of the testator. Should this be admitted, it will not be sufficient for our purpose. How the fact is, is not necessary here to be examined ; it is not warranted, however, by the authorities he refers to. On examination they will be found (without exception) cases of limitation to the *heir* in the singular, to *sons* in succession, to *children,* or in *trust*. The positions also there advanced, that the *reason* of a rule having ceased, the rule itself may

be departed from, and that trust estates are subject to the same positive rules and general maxims in equity, as legal estates at law, though, in general correct, are not always so, and I think, cannot, without great hazard, be applied to the subject before us.

It is true, as his lordship asserts, that this rule or maxim was the offspring of the ancient feudal tenures, and that *they* have ceased. But have not the rights of primogeniture, and numberless rules governing the transmission of real property, sprung from the same source; and can courts of justice disregard these because the *reason* of them has ceased? It certainly would be a dangerous experiment.

The second position also is *here* inapplicable. Trusts were ever independent of tenures, and, therefore, not governed by the rules springing from them. They were, in their origin, mere creatures of mutual confidence, arising out of the intent of the party creating them, and to be governed and construed by that alone. Equity, however, to preserve as far as possible uniformity of decision with the courts of law, has ever respected this rule, except in cases of mere equitable trusts, when an adherence to it would defeat the manifest intent of the party creating them.

The case of *Bagshaw* v. *Spencer*, (1 Vesey, 142; 2 Atk. 517,) on which his lordship so much relies, is of this description: Lord Hardwicke reversed the decree at *the rolls in the point involved in our case, on the [*394] ground that it was a trust in equity and not a mere legal estate, the fee being in the first instance vested in trustees, with a power of sale, for the payment of debts; and that the intent of the donor to give an estate for life only to Benjamin was manifest, from its being without impeachment of waste, and the limitation to trustees to support contingent remainders, with remainder to his first and other sons in strict settlement. The distinction between a trust and legal estate, is, in this case, well established; and also the principle that a court of equity may be more liberal in the construction of words, to make them agree with the intent of the party, than a court of law.

The decision in *Coulson* v. *Coulson*, (2 Str. 1125 ; 2 Atk. 246,) is founded on this distinction.   It was a mere legal estate ; and though the devise was for life, remainder to trustees to support contingent remainders, remainder to the heirs of the body of Coulson, it was on this distinction held to fall within the rule.   And although Lord Mansfield (Doug. 323) questions that decision, (which was on a certificate of all the judges,) and asserts that Lord Hardwicke wished the principle of it to be reviewed, we find him afterwards in *Hodgson* v. *Ambrose* declaring it his opinion it was too late to litigate it ; and Justice Buller, going still further, and avowing himself satisfied with it ; though he admits he once had doubted it.   Notwithstanding the various arguments in *Long* v. *Laming*, calculated to subvert the rule, we find in the conclusion of it, the decision resting principally on the ground of the lands being *gavelkind ;* and Lord Mansfield deserting the real turning point of the case, and resorting to principles wholly unsubstantial.   The word *heir*, says he, is always a word of purchase ; and *heirs* in *gavelkind* is tantamount to *heir*, in ordinary cases.   That *heir* has been often, under certain circumstances, construed a *nomen collec-*

[*395]   *tivum* is apparent from the authorities cited by Hargrave, in his note on Co. Lit. *86, from 1 Vent. 230, and Bulst. 219.   Were it always a word of purchase, and *heirs* in gavelkind only equivalent to it, it would be difficult to invent terms of inheritance that would create a fee-simple by deed of such lands.   The usual circumstance which takes the case out of the rule is, that the limitation was to daughters as well as to sons.

In *Perrin* v. *Blake*, this subject underwent a more thorough examination than it had ever before experienced, which resulted in a final difference of opinion among the justices of the king's bench.   It was distinguishable from *Coulson* v. *Coulson*, by the strong circumstance of the testator's declaring it his intent, that *none of his children should sell this estate for longer than their lives*.   A majority of the judges held this sufficient to place it out of the rule, and

Brant v. Gelston.

decided accordingly. This decision was afterwards reversed in the exchequer, seven judges to five.

The numerous authorities on this subject are very ably analysed by Mr. Fearne, except, perhaps, the case of *King* v. *Burchell*, (Amb. 379,) which is in the precise words of our case. The superadded words, *equally to be divided between them, share and share alike*, are inserted in the case as reported by Ambler ; but are not noticed by Fearne, probably from an opinion that they were not sufficient to distinguish it from *Goodright* v. *Pullyn* and *Wright* v. *Pearson*, where the terms of inheritance are general.

My opinion is, that Helena took an estate for life, with a vested remainder in tail, to take effect in possession on the demise of her husband, and that the superadded words, "*and to his, her or their heirs and assigns forever, equally to be divided between them, share and share alike*," must be rejected as repugnant to the estate created by the precedent words of the grant. That it being stated in the case, that Cortlandt entered and was seised, under the conveyance from Brewerton and his wife ; that Brewerton *in 1764 entered under the conveyance from Cort- [\*396] landt, and died seised in 1790 ; the act of 1786 found him in the uninterrupted possession of the premises under the conveyance from Helena, and confirmed his estate in fee-simple. The tenant, holding under his title, must therefore have judgment.

The remaining points I will also examine, although the first completely disposes of the questions.

*Mildmay's case*, (1 Co. 175,) and the several authorities founded thereon, determine it still to be a rule of law, though the reason of it probably ceased with the statute of uses, that a consideration is necessary to raise a use in all conveyances that do not operate by transmutation of possession, and that such use is well limited to those only who are within such consideration ; that an appointee, under a power, is generally held to be within the rule, because the uses limited by the power must be such as would have been good if limited by the original deed. On the authority of this rule, the objec-

tion to the power contained in the deed of 1762 is raised ; because of its generally authorizing appointment, which may not fall within the consideration, which it is insisted is that of natural love and affection alone ; and so the deed, operating only as a covenant to stand seised. In answer, it is said, that the deed will well enure as a bargain and sale, and that the reservation of rents and profits is tantamount to a monied consideration, and the case of *Barker* v. *Keate,* where a pepper corn only was reserved is relied on. (1 Mod. 262. 2 Mod. 269.) If this was a conclusive authority, all questions between the parties on this point of the case would be at an end. But in that case the consideration was general, and, therefore, there could be no objection to considering the reserved rent the only consideration intended by the parties. It was also to raise a use for the sole purpose of supporting a common recovery, which the court thought themselves bound to favor. But in our case, the consid-
[*397] eration is express, *and falls within the maxim of *expressum facit cessare tacitum,* precluding all averment of a consideration inconsistent with it. I shall consider this power, then, as created by a covenant to stand seised to uses, and shall examine whether it is such a one as the rule will embrace.

Every declaration of a use, is, in some sort, an appointment ; (Co. Lit. 276, *a, b,* notes ;) but those only are technically so considered, where the power is first reserved or given, with a subsequent limitation of uses, to take effect until or in default of the appointment ; or where the uses are first limited, with the power of limiting others, which operates when executed as a *revocation* of the former. All the authorities I have been able to meet with, of powers determined to fall within the rules, have been of one or other of these descriptions. The one we are examining is of neither. There is no limitation expressly to take effect until or in default of an execution of the power ; no power of limiting new uses, which *shall of necessity* operate as a revocation of the former. For, had the power been executed by devise, instead of deed, the first uses would not have been revoked,

though they would have been expended previous to the creation of the new uses. As no authorities are to be found extending the rule beyond a power of appointment, strictly and technically such, it warrants a presumption at least, that all others are exempt from its operation. This presumption is strengthened by a recurrence to the maxim " *all the powers being derived from equity, are, even in a court of law, to be construed equitably,*" (3 Burr. 1446,) so as to effectuate, if possible, the intent of the donor. I am, therefore, strongly inclined to think, this ought rather to be considered an authority to sell than a power to appoint. It may be objected, that it ought then to have been executed in the name of the donor. To this there are two answers: First, that an authority, coupled with an interest \*may be executed [\*398] in the name of the donee: Second, that the execution was pursuant, in this instance, to the letter of the authority which required it to be done under his hand and seal.

Another important consideration is, whether this rule extends to a power created for the sole benefit of the donee? On this point, I have met with no direct adjudication. The authorities I have examined relate, without exception, to cases of a different description. There is one, however, from which it may be inferred that such a power is not within the rule. The case I allude to is that of *Goodtitle* v. *Petto*, (Str. 934.) There A. in consideration of love and affection, and to make provision for his wife in case she survived him, covenanted to stand seised to the use of himself and her, for their joint lives, and the life of the survivor, remainder to the use of such person as she should think fit to dispose to. The court held, that because the appointment was not to be *for the benefit of the wife*, but that she had a naked power *for the benefit of strangers only*, the appointee could not take; clearly intimating it had been otherwise, had the power been to be created for her benefit.

Another inquiry, equally important, is, whether the conveyance of a freehold estate, coupled with a power to dis-

pose of the fee, does not vest a qualified fee-simple in the donee of the power.

In *Jennot* v. *Hardie*, (1 Lev. 283,) lands were devised to E. for life, remainder to A. in tail, and on his dying without issue in the life of E. then to E. to dispose of at her pleasure. This was held to vest the fee-simple in E.

In *Whishon* v. *Clayton*, (1 Lev. 156,) the devise was to W. after the death of the testator's wife, and if he failed, then to the discretion of his father. This was held a fee-simple in the father.

In *Pearson* v. *Otway*, (2 Wils. 6,) the devise was to Agnes for life, and in case she should have no issue, [*399] *with power to dispose at her will and pleasure. This was held to vest a fee-simple in Agnes.

In *Bagshaw* v. *Spencer*, (1 Vesey, 142; 2 Atk. 577,) the devise to sell was held to carry the fee.

These, it may be said, are cases of devise, and that words in a will may create a fee, which cannot in a deed. This would, in a great measure, lessen their authority, were it not that the same latitude of construction is indulged on powers as on wills; for in each the intent of the party is to govern. The intent of parties who gave the powers ought to govern every construction, said Lord Mansfield, in *Taylor* v. *Horde*.

Another important view remaining to be taken of this point of the case is, to discover whether this power is not exempt from the operation of the rule, by means of the freehold interest vested in the donee of the power; and whether it embraces any other than naked or collateral powers. In the case at bar, the power, if such it may be called, as far forth as it might be executed by deed, was a power appendant; because of the interest which the donee had in the estate, as well as in the exercise of the power; and in such case it is held, that the person to whom the estate is limited by the execution of the power, is, in law, considered as coming in under him who executes the power, and not under him who creates it. (Powell on Powers, 12. Harg. Law Tracts, 415. 1 Co. 174, Digg's case.)

I am, therefore, of opinion, this power was well created.

The remaining question as to the execution of the power,

I think, admits of little doubt. It was created expressly for the benefit of the donee, her heirs and assigns, and there is no restriction on the exercise of her discretion, in the adoption of such mode of execution as she should think best calculated to produce this effect. She was the best judge of the confidence her husband merited ; and that her father was satisfied with the *disposition she made, [*400] and was probably privy and assenting to it, may fairly be inferred from his never having demanded rent during the fourteen years that he survived his daughter.

I am, therefore, of opinion, that the defendant is entitled to judgment.

RADCLIFF, J. not having heard the argument, gave no opinion.(b)

Judgment for the defendant.(c)

(b) LANSING, Ch, J. had left the bench, having been appointed Chancellor on the 28th October, during the term ; and LEWIS, J. was on the same day appointed Chief Justice.

(c) Mr. Hilliard, in his Abridgment, observes, that " The rule in Shelly's case is undoubtedly in force in this country, as a settled principle of the English law, except where it has been changed by express statutes. In Connecticut, Michigan, New York and Ohio, the rule is abolished by statute. In New Jersey it is provided, that where there is a devise to one for life, remainder to his heirs, issue or the heirs of his body, the life estate is good, but after his death, the estate passes to his children or heirs. In Maine and Missouri, a devise, and in Maine, a deed, to one for life, then to his children or heirs or right heirs in fee, passes a life estate to the former, and a remainder in fee to the latter. In Rhode Island, the same construction is given to a devise for life, remainder to the children or issue in fee simple. In New Hampshire an express particular estate created by devise, is not enlarged by a subsequent devise to heirs or issue. In Massachusetts, a conveyance or devise to one for life, and after his death to his heirs in fee, or by words to that effect, gives him a life estate, and a remainder in fee to his heirs." (Hilliard's Am. Law of Real Property, 2d ed. vol. 1, p. 647.)

In England, this rule has been recently abrogated by act of parliament. Statute 3 & 4 Wm. IV. provides that a devise to the heir shall pass the estate to him as devisee, not by descent ; and that a limitation by deed to the grantor or his heirs shall create a new estate by purchase ; and where one takes by purchase or will, under a limitation to the heir or heirs of the body of the ancestor, the descent is to be traced, as if such ancestor had been the purchaser. (4 Kent, 228, n. Id. n. (b.))

Consult, upon the rule in Shelly's case, Hilliard's Am. Law of Real Pro-

perty, vol. 1, 627–647.    4 Kent's Comm. ed. 1844, p. 214, *et seq.*    Coke on Litt. Thomas' ed. vol. 2, 143–150, and note *p.*    Mr. Butler's note 10, p. 534. Mr. Preston's succinct view of the rule in Shelly's case, *passim.*    Fearne's Cont. Rem. Eng. ed. 1844, vol. 1, 28–201, and n. *l.* ; and see id. 694–703, index and references ; see id. vol. 2, 206–248.    2 Jarman on Wills, Am. ed. 1845, p. 241–361.    Crabb's Real Property, 987, 1405, 1617, 2350.    Shepherd's Touchstone, Mr. Preston's ed. 414, n. 85.    2 Sugden on Powers, Am. ed. 1846, p. 24, *et seq.*    Cruise's Dig. ed. 1806, p. 324, *et seq.*

